Davis, J.,
delivered the opinion of court:
In Mimmack’s Case, decided at the late term of the Supreme Court, it was held that a written resignation to the President or the proper executive officer and the acceptance of the same, duly notified to the incumbent in the customary mode, creates a vacancy in an office.
In the present case there was a written resignation of his office by the claimant, admitted to be under his signature, and to have been sent by him with a purpose that it should reach the proper executive officer. This resignation was duly accepted, and the claimant was notified of the acceptance in the customary mode. If the case rested here, these facts would put the claimant in the position which Mimmack occupied when the Supreme Court held that he had no right to the office formerly held by him.
It is maintained, however, that the present claimant was of. unsound mind when he wrote and sent the letter which was accepted at the War Department as a resignation, and the court *474 find that there is ground for the contention. If this is so, the * element of sound conscious purpose was wanting to the alleged resignation.
A new feature, however, comes into the case with the appointment of a successor to the claimant. The statute permitted but thirty officers of the claimant’s grade in the Army. In consequence of his letter of resignation his vacant seat was filled by the combined act of the President and the Senate. His successor was duly commissioned, and entered upon the duties of the office, and has received the emoluments for which the claimant now sues. This action is, therefore, in effect an attempt to try, under the form of a suit for deferred salary, the respective rights of these gentlemen to the office in question. It is to be observed that but one of them is in court.
The claimant rests his case on the alleged fact of insanity when he wrote his letter of resignation. If the War Department had acted in ignorance of this fact, or if it had displaced him after a full knowledge of it, a case unlike the present one would have been presented. In this case the findings show that the claimant had been suffering from physical disease and mental prostration for some time before he wrote his letter of resignation. It was not until after the date of that letter, however, that these symptoms developed to such an extent as necessarily to induce persons who came in contact.with him to believe that he was mentally incapable of acting with sound reasoning purpose.
After the letter had been put into the hands of the commandant of the post to be forwarded to Washington, it was brought to the notice of that officer that the claimant was in an excitable frame of mind, and that it was questionable whether he was responsible for his acts. The commandant did not forward the letter until a week after it was written. Presumably, he delayed in order to inquire about the claimant’s condition and to ascertain whether he did or did not know what he was about. The results which were reached are stamped in unmistakable terms on the recommendation which accompanied the claimant’s resignation. We find there none of the tenderness with which a gallant soldier would naturally treat a brother officer afflicted with the most terrible malady that can befall a man. On the contrary, it contains an urgent recommendation that the claimant’s resignation be accepted, because the commandant looked *475 upon him as a disadvantage and a reproach both to the Church and the Army. It is, therefore, clear beyond all reasonable doubt that this officer, after personal inquiry, reached the conclusion that the claimant was not of an unsound mind, and that his eccentricities were not attributable to insanity.
In all this the commandant acted on the very question which we are now asked to pass upon. He was the proper executive officer to act on that question. From the nature of the case and from the character of his command he was authorized to pass upon it; it was his duty to decide it. Nobody intimates, nobody thinks that his decision was influenced by improper motives or that it was not in accordance with his own best judgment. Seen in the light of subsequent events, the decision was probably wrong. Viewed in the light of contemporaneous evidence, it was right in the judgment of the commandant. It was not questioned at the War Department, and we are all of opinion that we have no power to review or question it here.
Even if we had that power, it would be presumptuous to say with dogmatic certainty that the commandant erred when he trusted to the evidence of his senses. It is one of the most difficult of problems to fix the moment when a sound mind yields to its hallucinations and becomes incapable of further healthy action. A recent critic says: “The doctors of the insane have been studious of the state of Hamlet’s mind — Doctors Ray, Kellogg, Gonolly, Maudsley, Bucknill. They are unanimous in wishing to put Hamlet under judicious medical treatment, but they find it harder than Polonius to hit upon a definition of madness:
1-for to define true madness,
Wliat is’t fiut to fie nothing else fiut mad ? ’ ”
The suggestion in the criticism is acute and just. Experts may exhaust their learning in reading insanity through the lines of letters and written diagnoses; but they cannot infallibly tell why one man is mad and another is not, or why the first is insane at one time and sane at another. It is not safe to put absolute faith in their judgment, especially if it calls for a disregard of the results which intelligent laymen reach from a personal study of the condition of the alleged insane person.
The claimant’s history presents many circumstances calculated to excite sympathy. If the court as a body were allowed to give heed to the sympathies of the individuals who compose it; *476 perhaps its judgments would accord less with what it holds to • be sound principles. It is to be observed, however, that the claimant’s position before the government in this matter is somewhat analogous to the position of a person of unsound mind in an ordinary civil tribunal. A' contract made by such a person can be enforced there only in certain exceptional cases, where hé has received a quid pro quo which controlling principles of policy require the court to recognize. In like manner, no force would be knowingly given by an executive officer, or by the law advisers of an Executive Department, to a resignation tendered in a state of insanity; and if a resignation offered under such circumstances should be accepted without knowledge of the facts, there can be no doubt that, on their coming to the knowledge of the executive officers, the inadvertence would be rectified as far as possible. (6 Op. Attys. Gen., 450; 10 id., 229; opinion of Attorney-General Devens in the present case.)
On the other hand insanity is no protection in the courts against liability for the direct and proximate consequences of acts of an insane person which are not in the nature of contract. As between two parties alike innocent of intent to cause injury, the law says that the party by whose act the injury comes shall be the sufferer, without regard to the intent or capacity of intent to cause it. In the same way, the department says, in effect, to the claimant, whatever we might have been willing to do for you had the vacancy hot been filled, we can do nothing-now. As the result of an act which is none the less yours that you did it without conscious purpose, another has been put in your place, and has acquired rights which we cannot disregard. If one of two innocent parties must suffer, the law lets the injury fall on him by whoso act it became inevitable, and his remedy must be sought in Congress, not in the courts.
In the view which we take of this case it has become unnecessary to consider the act of 1866 (Bev. Stat., § 1229), which was the subject of discussion on both sides at the trial. If the claimant fell out of the Army by resigation, a statute relating to dismissals does not touch his case; and, in any view that can bo taken of the facts, it is impossible to regard tlie claimant’s retirement as a dismissal within the meaning of‘the term as used in the act of 1866. We have also purposely omitted to consider either the constitutional effect of the nomination and confirmation and commissioning of Gilmore upon the status of the claimant, or *477 .the narrower question of tbe power of tbis court to review tlie action of the President in accepting a resignation. On the latter point I express my individual concurrence with the doctrine laid down by my brother Nott in Mimmack’s Case, that “whether an officer of the Army has resigned or has not re. signed is a question which the judiciary cannot try. A certain piece of paper is indeed before the court bearing the appearance of a resignation, but whether it was such or not the President alone could decide.” (10.'C. Cls. K>., 599.)
Resting its decision, however, solely on the ground first above stated, in which we all unite, the court directs that the claimant’s petition be dismissed.
Drake, Oh. J., was absent when this case was heard and took no part in the decision.