Nott, J.,
dissenting:
The Constitution declares that the President shall be Commander-in-Chief of the Army and Navy — an undefined term, but one to which some effect must be given. If we .turn to the British Government as illustrative of the intent of the framers of the Constitution we find that the authority of the Crown over the army on the one hand’was to all intents and purposes alsolute; but on the other that the continuance of the army was dependent upon the ann ual assent of Parliament. In other words, the standing army of England was in contemplation of law never more than one year old. Within our own time we have seen Parliament refuse to abolish, by law, the system of purchase, and the Crown immediately thereafter, by royal warrant, pirohibit a system of admission to the army substantially as old as the army itself. But for the purposes of the present case it is not necessary to define the powers of the Commander-in-Chief, and I only allude to this provision of the Constitution to establish this simple proposition, that the relations of the President with the Army are not created by statute.
The question, however, presented by these cases is not whether Congress may curtail a discretion long exercised by the Commander-in-Chief, but whether the judiciary shall do so.
There is a train of decisions, beginning with the case of Decatur v. Paulding (14 Peters’s R., p. 497), and continuing down to the case of Frelinghuysen v. Key (110 U. S. R., 63), in which the Supreme Court has uniformly held that an inherent discretion attaches to the high executive officers of the government— a discretion not given by statute law nor dependent upon it. And if any general principle can be formulated from those *357 cases, it is that the discretion of a Secretary is so broad and general that there must be a special enactment assigning a specific duty to reduce him to the level of a ministerial officer.
In the light of those decisions the Supreme Court might well repeat its utterance in the earlier case of the United States v. Macdaniel (7 Peters’s R., p. 14), and say now as it said fifty years ago—
“A practical knowledge of the action of.any one of the great departmentsof the government must convinceevery person that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by the law, but it does not follow that he must show a statutory provision for everything he does. No government could be administered on such jn’inciples. To attempt to regulate by law the minute movements of every part of the complicated machinery of government would evince a most unpardonable ignorance on the subject. Whilst the great outlinesof its'movement may be marked out, and limitations imposed on the exercise of its powers, there are numberless things which must be done that can neither be anticipated nor defined, and which are essential to the proper action of the government.’’
Notwithstanding the constitutional origin of the President’s authority ; and notwithstanding the unquestioned exercise of his discretion for a great number of years, and notwithstanding the decisions of the Supreme Court concerning the judgment and discretion of the heads of the departments, a dozen different cases now bring before this court in a dozen different ways the question whether there is attached to the office of President the inherent judgment and discretion which will enable the executive head of the nation to revise in proper cases his own acts, or whether, as in the case of a ministerial officer, his discretion is only that which is given by statute, and his official authority is exhausted as soon as exercised.
In some of these cases the question is whether a President who has improvidently issued an order can, by its revocation, annul its evil consequences. In others, the question is whether a President who ought to have made an order on a certain day can subsequently effect the same legal result by an order entered nune pro tune. But in all, the questions presented may be resolved into the simple inquiry whether the President, in matters of executive and military jurisdiction, is vested with judgment and discretion which, when exercised within its own *358 proper sphere, cannot be questioned elsewhere, or whether h acts are subject to the judicial scrutiny that ordinarily is extended to the acts of ministerial officers.
There are several considerations which forbid that the discretion of the Executive should be thus curtailed.
In the first place, there must inevitably come before the executive head of a great nation innumerable questions of the gravest magnitude: questions of life and liberty, of the rights of persons, and the rights of things. No court determines more matters of grave import; no judge deals with so many. The President, moreover, has none of the machinery of judicial investigation, nor the unlimited time allowed to courts. His decisions rest on thee,v parte reports of his subordinates, and the vigor of executive administration requires of him that decisive action by which the public welfare is often purchased at the cost of personal injustice. And it is not desirable that judicial methods be forced upon the Executive, nor that the tardiness which is the reproach of justice should clog the more energetic branch of the government. Therefore, a doctrine which denies to the President the power to revoke, his own orders, to revise his own judgments, to correct his own mistakes, is a doctrine which must contain this inherent vice: that it compels the judiciary to overrule the deliberate judgment of the President, and to perpetuate his official errors.
I repeat this lest it be overlooked : If the acts of the President, revising his own proceedings, can be brought into court and attacked after twenty years’ effect has been given to them, and if the court must hold that the constitutional and legal power of the Executive concerning the dismissal and transfer of officers of the Army and Navy is exhausted as soon as exercised, this inevitable result must follow, that the judiciary must uphold in such cases the mistakes of the President and overrule his deliberate judgment.
In the second place, I know of no tribunals which have such ample means for arriving at correct results as courts of law, and no official acts to which the law ascribes such solemnity and finality as the judgments of courts. Their records import as has been often said, absolute verity. Yet I know of no court of record which has not power to correct its own errors by setting aside its judgments and entering orders nuno pro tuno. Is it possible that the chief executive officer of the government, *359 the constitu tionally-dec!ared Commander-in-Chief of the Army and Navy, has not the same discretion to revise his own acts in matters inyolving judgment and discretion which is conceded to every county judge in the land ? Indeed it may not be irreverent to say that that question involves the sum and the substance of the controversy.; the one side asserts for the President only the discretion of a county judge, the other maintains that the President has no more discretion than a constable.
It has been asked in the progress of these cases whether the President’s order dismissing or wholly retiring an officer does not put him out of the Army; and, if put of the Army, whether ho can be put back otherwise than by the nomination of the President and confirmation of the Senate; and whether, if the officer be not thus restored, he does not remain a civilian, and whether the President can put a civilian on the retired list?
These questions can best be answered by asking some others: If a court of competent jurisdiction render a decree of absolute divorce, would not the parties cease to be husband and wife; and if a man and a woman are not husband and wife how can they be brought within t'lie bonds of matrimony but by marriage; and if the local law require a marriage license before there can be a valid marriage (analogous to the confirmation of the Senate in the case of appointments), how can the court avoid that legal requirement and remarry the divorced couple by the evasive process of setting aside the decree? Moreover, if the woman has married another man ad interim, how can the Court divorce him, he being no party to the record and having had no day in court?
It may also be asked whether a magistrate or clergyman who solemnizes a marriage can revoke his act and leave the parties as they were before; and whether a notary who protests a note can revoke his notices and thereby discharge the indorser; and whether a commissioner who administers an oath can vacate his jurat and relieve the affiant from the penalties of perjury? To these questions I answer; 1st, that marriage is at law a contract of the parties; 2d, that the magistrate or clergyman is but the official witness of the transaction; 3d, that public policy iorbids that even the contracting parties can annul their own agreement; and 4th, that these supposed analogies are all cases of ministerial officers. I also note the fact that every one of the many illustrations adduced to support the *360 defendants’ position in these eases has been the case of a ministerial officer.
Agaiu, it may be asked if the President can act in the manner known in courts as entering an order nuno fro tuno, what is there to prevent his directing that an officer be commissioned of a date anterior to his entering the Army? And if the President can set aside an order “ wholly retiring” an officer and direct that he be placed on the retired list, what is there to prevent him from revoking the order which dismissed General Fitz John Porter, and from placing him on the retired list as of the antecedent date when he was cashiered? These questions, likewise, can be best answered by asking some others. Every court of record corrects its mistakes and delays by entering orders nuno pro tuno ; but can a court enter such an order as of a date anterior to the bringing of the action? Or can it exercise this power after it has lost jurisdiction ? Or can it use the power to destroy the intervening rights of third persons? Every court, within due limits, can vacate judgments and grant new trials, but can the judges of a court sit in review of their predecessors and vacate judgments rendered twenty years ago? Every court can correct, at any time, its own record and supply the omissions of its clerk, but can a court, in the exercise of this discretion, take away the legal rights of the party whom it has power to assist ? Undoubtedly the discretion of the President must be exercised within the boundaries of his legal powers and within the period of his official jurisdiction. Undoubtedly the discretion of the President may be abused, but the Constitution nevertheless places upon him the responsibilities of Oommander-in-Ohief. Undoubtedly men are hung who ought to be pardoned, and men are pardoned who ought to be hung, but the Constitution nevertheless places the pardoning power exclusively in the hands of the President. Undoubtedly bills have been vetoed which Congress and public sentiment desired should become laws, and acts have become laws replete with inaccuracies and obscurities that the President never should have approved, but the Constitution nevertheless gives the veto power to the President alone, and expects its exercise for the public welfare.
In the third place there are under our government certain methods of administration which the Supreme Court has termed systems. No statu e declares that the jurisdiction of the cir- *361 euit courts in matters of the custom revenues is exclusive, yet the Supreme Court has so held, because the means provided for ascertaining the facts in those cases constitute a system. (Nicoll's Case, 7 Wall. R., 122.) No statute declares that the proceedings, of the Commissioner of Internal Revenue in matters of refunding taxes shall be conclusive, but it is well settled that if the case be within his jurisdiction, his determination of the facts concludes both the accounting officers and the judiciary. It is true that there is no statute investing the President in terms with an exclusive jurisdiction, but it is equally true that when an Army and Navy were established responsibilities were created with them; that somebody had to determine questions connected with the official personnel of each service; that from the beginning the Commander-in-Ohief has exercised that responsibility; that during the whole life of the Army and Navy Congress has left the responsibility, the power, the discretion in the hands of the President; that until this court was reconstituted, in 1863, no practicable means existed for even indirectly reviewing his. discretion; and that if the judiciary now reduce his discretion in such matters to that of a ministerial officer it in effect will be a piece of judicial legislation more sweeping than the legislative power has ever sought to exercise over the constitutional functions of the Commander-in Chief. Nevertheless, the system which has assigned this jurisdiction to the President is a narrow one. It is an exclusive jurisdiction simply as to the administrative duties of his office; a jurisdiction exclusive in enabling him to exercise his discretion in the manner which he deems best, at the time which he deems best, of the time which he deems best; a jurisdiction exclusive in enabling him to correct his official errors within the limits of his legal powers, by rectifying the record of his lawful acts, and by determining what he has done and what he has intended to do. In other words, the President has authority to exercise his legal powers in his own way, and the struggle in all of these cases has been to tell the President that he must exercise them after the manner of a ministerial officer.
And here I desire to say that all that is maintained in this opinion concerning the exclusi%re j uri.' diet ion of the President was held by this court it Blake's Case (14 C. Cls. R., 462). There the court was face to face with the fact that the resigna *362 tion which severed an officer’s connection with the Army was the act of an insane man; a nullity in law; and if the court went behind the record of the War Department it must so hold. What did the court do ? It refused to review the decision of the Executive upon the sanity of the officer, and, speaking through Mr. Justice Davis, said, “ We are all of opinion that we have no power to review or question it here.” (14 C. Cls. R., 462.)
In the fourth place “usages had been established in every department of the government,” says the Supreme Court, “which have become a hind of common law” (United States v. Macdaniel, 7 Peters, p. 14); and if there be any common law of the executive branch of the government well settled, it is that the head of an executive department may revise his own acts but cannot reverse the rulings of his predecessors. (United States v. Bank of the Metropolis, 15 Peters’s R., 377, 401.) The discretion thus accorded to an assistant cannot well be denied to the chief. The limitation under which that discretion is exercised is analogous to the limitation which restricts courts in their exercise of a similar power in setting aside judgments and granting new trials, as was in effect held in the case just cited. It is proper that the President carry out his own intent and exercise his own best judgment; it is not proper that he set up his own judgment as better than that of the Presidents who have gone before him, or defeat their final decisions, or undo what they have legally done.
When the case of Major Montgomery (5 C. Cls. R., 93) came before this court it appeared that President Lincoln had dismissed summarily, or “ arbitrarily',” as he termed it, and without a hearing, one of the thirteen quartermasters having the rank of major in the regular Army; and had, moreover, appointed the officer’s successor. It also appeared that he had finally revoked his ow'n order of dismissal, thereby in fact, if not in law, restoring the officer to the Army. The court gave to that case most careful consideration, and approached its decision with this threefold purpose: 1st. Of maintaining the laws of Congress; 2d. Of upholding the discretionary power of the President; 3d. Of doing no injustice to either officer. The rule laid down by the court as its conclusion was this:
“An order of the President dismissing a military officer may be revoked by the same President that issued it, and if the office be not filled at the time of revocation, and if the pay thereof has not *363 been paid lawfully to another, the dismissed officer will be entitled to the office and to the pay ad interim ; but if the office be filled by another the revocation mustremain suspended till a vacancy occur ; and if the pay ád interim has been paid laufully to another the officer must talce his reinstatement cum onere. The defendants cannot be held to pay a second time.” (5 C. Cls. R., 93.)
Fifteen years have now elapsed since that decision was made, and many such cases have come before this court, but I have heard no rule suggested which will better carry out the threefold purpose of maintaining the laws of Congress, the necessary direction of the President, the just rights of officers of the Army. It is easy to frame a rule which will accomplish one of these purposes; but the object of the judiciary should be to attain all.
As the adverse doctrine contended for by the defendants’ counsel is founded upon a literal application of certain expressions of the Supreme Court in Mimmack’s, McElrath’s, and Blake’s cases, I proceed to inquire whether the. rule in Montgomery’s case has been overruled by those decisions, and with what effect it might be applied to the cases now before this court?
3. The Supreme Court was not aware when it gave utterance to those expressions that they might be used to oust officers who have been in service more than twenty years. For if the use now made of them is sound — if the President is without discretion to correct his own errors — if an officer dismissed by mistake cannot be restored by the President who dismissed him; if the revocation, in due time, of an erroneous order is a nullity; if the court can go behind the President’s record of the President’s act and undo what he has done, and deny what he says he ought to have done; if those officers who, in time of war, were dismissed without a hearing and who were actually restored, and finally retired; if they, when in active service, were nothing but civilians and remain nothing but civilians to this day, there is no saying how many officers who have grown gray in their country’s service will lose their commissions through this recent theory of Executive inability. Let us take as an illustration this old case of Major Montgomery. President Lincoln dismissed him in 1863 and reinstated him in 1864; he continued in active service for ten- years; he was then retired (the Ar ny Register tell us), after more than thirty years of active service, and he is now upon the retired list. Will the *364 Supreme Court, because of expressions proper and pertinent in the cases in which they were uttered, hold that the revocation of President Lincoln was lawless; that through the subsequent years of active service Major Montgomery was but a civilian; that President Grant was mistaken when he promoted him to be lieutenant-colonel, and the Senate mistaken when it confirmed the nomination; and, most extraordinary of all, will the Supreme Court hold that from 1864 to 1872, during’ which period three Presidents, and the Senate, and the War 'Department supposed the list of quartermasters to be full, there was, in fact, always a vacancy; and where the name of Alexander Montgomery was supposed to be there was, in law, always a blank 9
In a word, this court is now asked to extend those expressions of the Supreme Court to a different class of cases, and to lay down a harsh and needless rule, which will save a few dollars to the Treasury, will greatly curtail the rightful discretion of the President, will hinder the administration of executive business, will do great wrong to many officers to whom the public faith was long since pledged, will certainly destroy the tenure of office of a large number of officers, and which, for anything the court knows to the contrary, may .shake the positions of half the retired list.
2. I come now to the inquiry‘whether the rule in Montgomery’s case has been overruled in cases that have been before the Supreme Court.
Mimmack's Case (10 C. Cls. R., 584; 97 U. S.R., 426) was founded upon the resignation of the officer, and not upon the dismissal of the President. The officer was never reinstated in fact; the order of revocation was never promulgated, it remaining inter partes a matter between the outgoing President on one side, the Secretary of War and the General of the Army on the other. Such being the undefined condition of affairs when the new President came into office, he took up the unsettled matter and settled it by deciding that the paper purporting to be a resignation was in fact the resignation of the offic'er. Finally, the pay which Mini mack sought to recover had been paid to another, which under the rule in Montgomery’s case was fatal to a recovery.
And here I desire to note the distinction between cases founded on resignation and dismissal. Where an officer re *365 signs and his resignation is accepted, and he is notified of the acceptance, the statute comes in and renders a mutual act of severance complete. But whether the paper purporting to be a resignation is a resignation, and whether the order purporting to be an acceptance is an acceptance, are matters to be decided by the President. Hence, where the officer, instead of accepting the severance, controverts its mutuality, and asserts that the resignation is a forgery, or was stolen from his trunk, or transmitted while he was insane, it is within the jurisdiction of the President to inquire into the matter, and revoke an order which had no legal foundation.
The opinion of Attorney-General Evarts in Mimmack’s case has been cited with deserved commendation to sustain the defendant’s position. But the Attorney-General, with the intuition of a true lawyer, points out the distinction between cases where the severance was mutual and not mutual; and he, in effect, concedes that, where the resignation was not “valid or efficient,” the President may pass upon the question of resignation or no resignation, and revoke his order of acceptance.
In McElrath’s Case (12 C. Cls. R., 201; 102 U. S. R., 426), the officer sent in his resignation and was dismissed; he acquiesced in the dismissal; seven years afterwards, and under another President, came the so-called revocation, and during the seven years’ interval the pay of the office had been lawfully paid to another. It is therefore manifest that the rule in Montgomery’s case could have disposed of McElrath’s claim thrice over.
Blake's Case (14 C. Cls. R., 226; 103 U. S. R., 22) was one of resignation, and not of dismissal; the President who accepted the resignation did not revoke the order; the question of the officer’s sanity was not raised until after he.had been notified of the acceptance; the President who accepted the resignation held the question of his insanity under advisement for a year, and decided it by appointing his successor; the claimant sought to recover the pay ad interim which had been lawfully paid to another; no counter-claim was set up by the defendants as to pay which he had received; and the suit was brought upon the theory that the court would pass upon the question of sanity, and hold that both the resignation and the acceptance were absolutely void.
*366 It is manifest that the question of revocation lay at the very threshold of the case. If the Supreme Court deemed the order of the President accepting the resignation irrevocable, ’twas easy to say so, and that was the end of the case. Did the Supreme Court say so % No ; on the contrary it said to the claimant, in a most careful and elaborate opinion, substantially this : The President, with the concurrence of the Senate, had power to remove you in time of peace, notwithstanding that the Act 13th July, 1866 (12 Stat. L., p. 92, § 5, ch. 176), assures to officers a trial by court-martial before the President alone can dismiss them. Therefore, you cannot recover pay after your successor was appointed. As to the pay which accrued between the acceptance of your resignation and the appointment of your successor, it is barred by the statute of limitations.
Judging from what the Supreme Court said, and from what it refrained from saying, I infer that the judges thought that President Grant might have' revoked his own order of acceptance, and that they did not wish needlessly to decide that President Hayes could not review another President’s decisions nor revoke his final action.
What, then, are the distinctive facts of these three cases ? That in all of them there was the resignation of the officer ; in none of them restoration to office by the President who acted on the resignation. Whether they become binding authorities in cases where the distinctive facts are actually the reverse of these — in cases where officers did not resign and were reinstated by the President who dismissed them, it may not be unreasonable to doubt.
As to Keyes’s Case (15 C. Cls. R., 532; recently affirmed), it is enough to say that the purpose of the action was to have this court review the proceedings of a court-martial, and declare the President’s approval of its sentence illegal and void. The officer was cashiered; the sentence was carried into effect; no revocation was made; no reinstatement attempted.
I now proceed to inquire how the rule in Montgomery’s case will apply to the cases before the court.
In Lieutenant Miller’s Case the question is really not one of restoration to the Army, but of transfer from one list of retired officers to another.
*367 The Retiring Board had found this officer unfit for active service;, the President agreed that he was unfit for active service ; the officer conceded that he was unfit for active service. But he at the same time claimed that he had been erroneously placed on the “wholly retired” list, and instantly appealed to the President from the conclusion of the Retiring Board.
“For officers leaving the Army or Uavy there is no term analogous to-discharge; if they leave the service honorably they leave by resignation or retirement; if they leave dishonorably they are dismissed or cashiered.” (General Emory's Case, ante.) The President was not required to dismiss Lieutenant Miller by the Act 3d August, 1861 (12 Stat. L., p. 289, § 17), but to retire him. Two classes of retired officers were designated by the statute: the one “retired,” with pay for life irpon certain conditions, the other “ wholly retired,” with pay for one year; and it was within the statutory power of the President to place the retired officer in whichever class he saw fit.
Amid these circumstances what was the duty of the President? If he were a ministerial officer his functions were at an end when he improvidently approved the finding of the Board. If he were an executive, officer it was his duty to exércisq his discretion in furtherance of justice. How was he to exercise this discretion? Must he refrain from filling the vacancy on the active list to the detriment of the public service until he could examine into the rights and wrongs of the retiring officer ? Or must he lay aside other public business and examine the case on the instaut, so as to send Lieutenant Miller’s successor promptly to the field ? The course which President Grant pursued was, in my judgment, not merely what he might have done, but precisely what he ought to have done. He held Lieutenant Miller’s appeal under advisement; he appointed an officer to take his place on the active list; he reinvestigated his case, and he finally transferred him, not to the active list, but in conformity with the recommendation of the Surgeon-General, from the list of “whollyretired” to the list of retired officers. The action of the President was replete with common sense and a love of justice.
In Capt. Robert H. Montgomery's Case the claimant was a second lieutenant in the Fifth Cavalry. While a prisoner of war he was dismissed by President Lincoln. Subsequently the order was revoked “by direction of the President,” and on the *368 same day the claimant was assigned to duty as second lieutenant in his own regiment. He served as such and was paid as such and was promoted as such. After five years’ service he was again promoted, and is now a captain, or supposed to be a captain, in the service.
Upon the foregoing facts the government contends that it should recover back all the pay paid to Captain Montgomery since he was dismissed in 1863, amounting to $42,636. And the reasoning by which this result is reached is this, that President Lincoln was mistaken in thinking that he could revoke his own order and thereby expunge the record of the officer’s dismissal, and that President Johnson was mistaken in thinking that he could promote a civilian to be a first lieutenant, and that President Grant was mistaken in thinking that he could promote a civilian to be a captain, and that the Senate was twice mistaken in thinking that Lieutenant Montgomery could be promoted when in law he was not in the Army; and consequently that all of the payments which have been made to the supposed officer were made without authority of law.
Under the rule in Montgomery’s case, it would be held, first, that the order of dismissal being revoked by the President who issued it the officer was reinstated; second, that his successor having been immediately appointed, and no evidence having been offered by the claimant to repel the presumption, it must be inferred that the pay of the office was lawfully paid to another, and that he, like Major Montgomery, must take his reinstatement cum onere.
In Chaplain Palen's Case the claimant was one of a list of officers mustered out in September, 1865, because their “ services were no longer needed.” In March, 1866, the order was revoked by the President, and the claimant thereupon returned to duty. He was paid, so long as he remained in service, and the defendants now seek to recover back the pay. Under the rule, in Montgomery, it would be held that he was reinstated ; but it is not necessary to pass' upon the question of the President’s authority, inasmuch as we are all agreed that the government cannot recover back the pay of an officer defacto.
In Captain Bennett’s Case the claimant resigned, his resignation was accepted, and he was notified of the acceptance. The case is submitted upon those facts, and there is nothing to explain the revocation which speedily followed, nor to show *369 that the President retained jurisdiction of the officer. His assent to the revocation we may infer; but on the naked facts presented we must also infer that with his own concurrence he had then ceased to be an officer in the Army. This case is simply one of resignation, and, for the reasons stated when commenting upon Mimmack’s case {ante), I concur in holding that the defendants may recover back the pay which the claimant received ad interim.
Major Hun Idds Case fully justifies the restriction of the rule in Montgomery’s.case to “the same President.” It discloses the sentence of a court-martial “confirmed” by one President in 1873 and “disapproved” by another President in 1877. For reasons previously set forth, I concur in regarding the revocation of President Hayes as void, and in holding that the defendants should recover back the pay received by him for the intervening four years in which he was an officer neither de jure nor defacto.
After examining these cases now decided, and others still under advisement, I am constrained to say that the rule in Montgomery’s case best carries out what should be the threefold purpose of the judiciary — of maintaining the laws of Congress, of upholding the discretion of the President, of doing justice to the individual officer.
The majority of the court hold in these cases that the President cannot revoke his own order without authority of law; and in that proposition I concur. The majority of the court also hold that such authority of law does not exist, because it is not to be found in the statutes. I find it in the decisions of the Supreme Court (United States v. Macdaniel, 7 Peters, 14; Frelinghuysen v. Key, 110 U. S. R., 63); in the common law of executive usage; in' the necessity of such a power existing somewhere; in the fact that Congress have allowed the President to exercise it untrammeled since the Army and Navy were established, and in the inherent discretion which is the attribute of a great office.
This case of Lieutenant Miller and the following cases of Montgomery, Bennett, Palen, and Eunkle were decided upon the same day, and the above opinion of Nott, J., was entitled and filed as his opinion m eacli.